**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Cheryl Brands, | ) No. CV 08-8143-PHX-NVW |
| Plaintiff, | ) **ORDER** |
| vs. | ) |
| Lakeside Fire District et al., | ) |
| Defendants. | ) |

    Before the Court is Defendant Lakeside Fire District's (the "District") Motion for Summary Judgment (doc. #57). Also before the Court is Defendant Kyle McNeil's Motion for Summary Judgment (doc. #52). For the reasons set forth below, the Court denies the District's Motion for Summary Judgment, and denies in part and grants in part McNeil's Motion for Summary Judgment.

**I.    Background**

    Plaintiff Cheryl Brands began working for the District on November 18, 2000. The District is governed by an elected, five-member Board of Directors (the "Board"). The Board has budgetary control over the District and hires and fires the District's Chief. Employment decisions regarding all other employees are made by the Chief. At all times relevant to this lawsuit, the five members of the Board were McNeil, Bill Rawlings, Lloyd Wilmes, Frank Miller, and Lee Larsen.

Brands's first job with the District was as an Administrative Assistant. Her supervisor from the day she started until the day she quit was the District's Chief, Roger Mineer ("Chief Mineer"). Brands performed well and was quickly promoted. Between November 18, 2000, and July 2005, she received six salary increases, and her duties were expanded substantially. In his deposition, Chief Mineer described Brands's performance in glowing terms, "Her integrity was very good. Very, very honest . . . I never worked with somebody–you know she doesn't walk on water, but I never worked with anybody like that in my life."

At all times relevant to this litigation, McNeil was a member of the District's Board of Directors. He served as a Board member prior to the events giving rise to this litigation, and acted as Chairman of the Board on several occasions, most recently from January 2007 to July 2007. On at least two occasions, McNeil suggested the Board take actions that benefitted Brands. During a March 11, 2004 meeting in which the Board discussed the purchasing of a new truck for Chief Mineer, McNeil suggested that Brands be allowed to use Chief Mineer's old truck for official business. On July 26, 2004, although Brands had recently received a pay raise, McNeil suggested that Brands's pay be further increased in order to keep her employed with the District.

In March 2006, Chief Mineer changed Brands's title to "Division Chief of Administration." Shortly thereafter, Brands's annual salary was increased to slightly over $62,000. As of July 2007, Brands's annual salary was approximately $65,000.

On or about May 14, 2007, Brands visited McNeil's home so that he could sign the pay checks for the District's employees. At that time, McNeil was the Chairman of the Board. Brands claims that during the visit, McNeil told Brands, "I may be old fashioned, but I just don't believe that a woman should be doing what you are doing, should have the title of chief, or should be making the money you make." McNeil also told Brands that he did not believe that Brands, a woman, should hold a "wild land" or "red card," a certification that allowed her to be present at the scene of a fire. Brands alleges that McNeil also told other District employees and Board members that he did not think a

woman should be in charge of anything, that Brands was overpaid, and that women belong in the home.

Brands contends that McNeil subsequently began following her in order to pressure her to quit. She claims that she became aware that McNeil was following her sometime in August 2007. She saw McNeil follow her at least ten times between the spring and fall of 2007. According to Brands, McNeil followed her when she was returning to the office from Walmart after picking up office supplies, going to lunch at Kentucky Fried Chicken, dropping off her grandchildren at their daycare in the morning prior to her going to work, and after going to the post office, the grocery store, and then back home after work hours. Brands also claims that McNeil would park in the District's parking lot and would stare into the front of the District's office.

Around the time that McNeil began following Brands, he also began following Chief Mineer and other District employees. McNeil claims that he was following District employees, including Brands, to monitor their use of district resources. But Brands contends that McNeil began following other employees to cover up for the fact that he was targeting her. She submits that she was the first person that McNeil followed, and that after she resigned, McNeil stopped following other District employees. Kim Webb, another District employee, testified in his deposition that McNeil told him that he was "after Cheryl."

When Brands informed Chief Mineer that McNeil was following her, Chief Mineer confronted McNeil and asked him to stop. Chief Mineer also spoke to various Board members about McNeil's conduct, and encouraged Brands to file a police report.

On September 20, 2007, Brands filed a stalking complaint against McNeil with the Pinetop Police Department. The Pinetop police concluded that Brands's allegations did not meet the criteria for stalking under the Arizona Revised Statutes. Brands told the reporting officer that she was "fine" with that conclusion and that she did not want to file a complaint but her boss had told her to go to the station anyway. Brands also told the reporting officer that she did not fear for her safety.

On or about October 11, 2007, Chief Mineer met with Board Chairman Bill Rawlings, Division Chief Timothy Van Scooter, and Brands to discuss McNeil's conduct. On October 22, 2007, Chief Mineer wrote a letter to Chairman Rawlings stating, "it is imperative that the Board take whatever action is necessary to see that the detrimental actions by Mr. McNeil cease and desist." On or about October 25, 2007, acting on the information received from Chief Mineer, Board member Lloyd Wilmes authored a similar letter to Chairman Rawlings, criticizing the actions of McNeil. Wilmes wrote:

> It has come to my attention that actions over the last several months by Board Member Kayle McNeil are having an adverse effect on the morale, productivity and general welfare of the employees of Lakeside Fire District. I am told that he has been following employees, driving past their places of residence and noting their comings and goings at lunch, response calls and off-duty times. He has also solicited information from employees for what may be perceived as for malicious purposes. These actions are being construed by the employees at the District as intimidating . . . . As you know, the authority of action by the Board lies within the power of the vote by a quorum of the members. Any fire district related actions that a Board Member undertakes that is not sanctioned by the approval of a majority of the members is outside the scope of the authority of that member. I feel that it is important that the Lakeside Fire Board make it clear in a public forum that it does not endorse, sanction, condone, authorize or approve of the aforementioned types of actions and behavior by one of its board members. Neither should we permit it. The Lakeside Fire District can ill afford the ramifications that may transpire because of these actions by Mr. McNeill. Board Member McNeil should be publically admonished for his behavior in this matter. Furthermore I suggest in the interest of preventing this type of behavior by Board members in the future, the board adopt a policy decreeing District business between the board and department employees be conducted through the Fire Chief and his primary staff only.

On November 15, 2007, the Board held a public meeting during which McNeil's conduct was discussed. Both Chief Mineer and Wilmes's letters were read into the record. Deputy Navajo County Attorney Lance Payette attended the meeting at the behest of Chairman Rawlings. Payette told the Board that McNeil's actions were performed as a private citizen and that Board members had the right to inform themselves about District business outside the context of a Board meeting. Payette also stated that, based on the information that was available to him, he did not believe that the facts gave rise to a cause of action under Title VII.

1    The Board did not initiate an investigation into Brands's claims. The Board also
2 did not take any of the actions suggested by Wilmes in his letter. After the meeting,
3 Chief Mineer heard McNeil saying, "I won; I won."

4    The day after the meeting, on November 16, 2007, Chief Mineer met with Brands
5 and with Deputy Chief VanScooter. During that meeting, Chief Mineer suggested that
6 Brands file a charge with the Equal Employment Opportunity Commission ("EEOC").
7 On or about December 7, 2007, Brands filed a complaint with the EEOC.

8    After the November 15, 2007 meeting, McNeil continued to follow Brands. She
9 claims that, as a result of McNeil's conduct, her health deteriorated. Her hypertension
10 worsened. She began to be fearful, anxious, and "paranoid." Chief Mineer testified that
11 McNeil's conduct had a devastating effect on Brands. He stated that her physical
12 demeanor deteriorated, her face often was "fuchsia red," and she frequently cried at work.
13 Chief Mineer's testimony was corroborated by other District employees.

14    Brands claims that McNeil's continued harassment, coupled with the fact that the
15 Board refused to take action, caused her to lose hope that the situation would improve.
16 Due to the effect McNeil's conduct was having on her, on January 29, 2008, Brands gave
17 notice that she was resigning. Her resignation became effective in February 2008.

## II. Standard of Review

Summary judgment is warranted if the evidence shows there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56©. The moving party must produce sufficient evidence to persuade the Court that there is no genuine issue of material fact. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). Conversely, to defeat a motion for summary judgment, the nonmoving party must show that there are genuine issues of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A material fact is one that might affect the outcome of the suit under the governing law, and a factual

1 issue is genuine "if the evidence is such that a reasonable jury could return a verdict for
2 the nonmoving party." *Id.* at 248.

3 The moving party bears the initial burden of identifying those portions of the
4 pleadings, depositions, answers to interrogatories, and admissions on file, together with
5 the affidavits, if any, which it believes demonstrate the absence of any genuine issue of
6 material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the nonmoving
7 party would bear the burden of persuasion at trial, the moving party may carry its initial
8 burden of production under Rule 56© by producing "evidence negating an essential
9 element of the nonmoving party's case," or by showing, "after suitable discovery," that
10 the "nonmoving party does not have enough evidence of an essential element of its claim
11 or defense to carry its ultimate burden of persuasion at trial." *Nissan Fire*, 210 F.3d at
12 1105-06; *High Tech Gays v. Defense Indus. Sec. Clearance Office*, 895 F.2d 563, 574
13 (9th Cir. 1990). When the moving party also bears the burden of persuasion at trial, it
14 must show that "the evidence is so powerful that no reasonable jury would be free to
15 disbelieve it." *Shakur v. Schriro*, 514 F.3d 878, 890 (9th Cir. 2008).

16 When the moving party has carried its burden under Rule 56©, the nonmoving
17 party must produce evidence to support its claim or defense by more than simply showing
18 "there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*
19 *v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Where the record, taken as a whole,
20 could not lead a rational trier of fact to find for the nonmoving party, there is no genuine
21 issue of material fact for trial. *Id.* The nonmoving party's evidence is presumed to be
22 true and all inferences from the evidence are drawn in the light most favorable to the
23 nonmoving party. *Eisenberg v. Ins. Co. of North America*, 815 F.2d 1285, 1289 (9th Cir.
24 1987). If the nonmoving party produces direct evidence of a genuine issue of material
25 fact, the motion for summary judgment is denied. *Id.*

26 **III. Analysis**
27     **A. McNeil's Motion for Summary Judgment**
28         **1. Intentional Interference With Contractual Relations**

It has long been recognized that "one who maliciously and without justifiable cause, induces an employer to discharge an employee . . . is liable in an action of tort to the employee for the damages thereby sustained." *Haddle v. Garrison*, 525 U.S. 121, 126 (1998). This includes third parties who are strangers to the employer-employee relationship. *See id.* ("The fact that the employment is at the will of the parties, respectively, does not make it one at the will of others.").

Arizona courts have adopted the formulation of the tort of interference with contractual relations found in the Restatement Second of Torts. *See Wagenseller v. Scottsdale Mem'l Hosp.*, 147 Ariz. 370, 388, 710 P.2d 1025, 1043 (1985), superseded in other respects by A.R.S. § 23-1501 ("We believe the Restatement approach most accurately reflects the tort of interference with contractual relations as it exists today."). The elements of the tort are: (1) the existence of a valid contractual relationship; (2) knowledge of the relationship on the part of the interferor; (3) intentional interference inducing or causing breach; (4) resultant damage to the party whose relationship has been disrupted; and (5) improper action on the part of the interferor. *Bar J Bar Cattle Co., Inc., v. Malcom Pace*, 158 Ariz. 481, 483, 763 P.2d 545 (Ct. App. 1998) (citing *Snow v. Western Sav. & Loan Ass'n*, 152 Ariz. 27, 34, 730 P.2d 204, 211 (1987); *Wagenseller*, 147 Ariz. at 386-88, 710 P.2d at 1041-43.

There is no question that the first and second elements of the tort are satisfied. There was a valid employment relationship between Brands and the District, and McNeil was aware of that relationship. Further, McNeil does not contend that Brands has not been damaged. McNeil contends, however, that his actions were not improper, and that he could not, as a matter of law, have caused Brands's discharge.

         **a.**      **Intentional Interference Leading to Inability to Perform**

"The tort of interference with existing . . . contractual relations includes interference with an existing contract either by causing a third party not to perform his contract with the plaintiff . . . or by preventing the plaintiff from performing his own contract or making that performance more expensive or burdensome." Restatement

(Second) of Torts § 767 cmt. a (1979). "One may be prevented from performing his contract in numerous ways. Thus, one may be physically restrained or intimidated or be excluded from the place where the contract must be performed . . . ." *Id*. § 766A cmt. g; *Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Local No. 395 Pension Trust Fund*, 201 Ariz. 474, 494-95, 38 P.3d 12, 32-33 (2002) ("There is no technical requirement as to the kind of conduct that may result in interference with the third party's performance of the contract. . . . While the paradigm case of tortious interference with contract may be that of a tortfeasor who induces breach by enticing the contracting party not to perform or by preventing or disabling that party from being able to perform . . . liability attaches to *any* intentional interference, whether by inducement *or otherwise*.") (emphasis in original) (internal quotations and citations omitted). "The interference with the other's performance of his contract is intentional if the actor desires to bring it about or if he knows that the interference is certain or substantially certain to occur as a result of his action." Restatement (Second) of Torts § 766A cmt. e. "The question of intent ordinarily is for the finder of fact." *Snow*, 152 Ariz. at 34, 730 P.2d at 211.

Brands alleges that, in order to force her to resign, McNeil followed her and harassed her for several months. Brands refers to comments McNeil made to her and to others to the effect that he did not believe that a woman should be doing Brands's job. Brands also points to the deposition of Webb who specifically recalls McNeill telling him that he was "after Cheryl." Drawing all reasonable inferences and viewing the evidence in the light most favorable to Brands, a rational trier of fact could conclude that McNeil intended to intimidate or otherwise pressure Brands to resign.

McNeil contends, however, that he is immune from suit pursuant to A.R.S. § 48-187, which provides that, "a person who serves on the governing body of a district is immune from civil liability and not subject to suit . . . if such person was acting in good faith and within the scope of his official capacity, unless the damage or injury was caused by willful and wanton or grossly negligent conduct of such person . . . ." McNeil argues that he was responsible for reporting the suspected waste of District resources and was

acting in his official capacity as a member of the Board in following District employees to monitor their use of District resources. The difficulty with McNeil's position, however, is that Brands's claim is precisely that McNeil was not acting in good faith, and that his conduct was willful and wanton, which would take his conduct outside of the purview of the statute. McNeil's rejoinder is that if he was not acting in his official capacity, he was acting as a private citizen, and his actions could not have interfered with Brands's employment. As noted above, however, a third party who is a stranger to an employment relationship may nevertheless be liable for interfering that relationship. *See Haddle*, 525 U.S. at 126. McNeil does not cite any cases that suggest that to intentionally interfere with Brands's employment relationship he would have to have been Brands's co-worker or supervisor. Therefore, his contention fails.

### b. **Improper Motive or Means**

There is ordinarily no liability for intentional interference with contract absent a showing that the defendant's actions were improper as to motive or means. *Wagenseller*, 147 Ariz. at 388, 710 P.2d at 1043, superseded in other respects by A.R.S. § 23-1501. Whether a particular action is improper is determined by considering the factors enumerated in section 767 of the Restatement: (a) the nature of the actor's conduct; (b) the actor's motive; © the interests of the other with which the actor's conduct interferes; (d) the interests sought to be advanced by the actor; (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other; (f) the proximity or remoteness of the actor's conduct to the interference; and (g) the relations between the parties. *Id.* at 387, 710 P.2d at 1042. "Conduct specifically in violation of statutory provisions or contrary to public policy may for that reason make an interference improper." *Wells Fargo*, 201 Ariz. at 494-95, 38 P.3d at 32-33 (2002) (citing Restatement (Second) of Torts § 767 cmt. c).

In *Wagenseller*, the Arizona Supreme Court dealt with a claim for intentional interference with contract brought by an employee against her supervisor. 147 Ariz. at 386, 710 P.2d at 101. The plaintiff was a nurse who worked for a hospital and had gone

on an extended rafting trip with her supervisor and other co-workers. *Id.* at 374, 710 P.2d at 1029. According to the plaintiff, an uncomfortable feeling developed between her and her supervisor as the trip progressed because the plaintiff refused to participate in activities her supervisor and other co-workers engaged in, such as public urination, bathing, heavy drinking, and "grouping up" with other rafters. *Id*. Following the trip, the plaintiff's supervisor began harassing her, using abusive language, and embarrassing her in front of others. *Id*. A few months later, the plaintiff was fired after receiving several unfavorable performance evaluations from her supervisor. *Id*.

The court first held that the plaintiff's supervisor did not have an absolute privilege to interfere with plaintiff's contractual relationship with her employer, even though the plaintiff's employment was at-will. *Id.* at 387, 710 P.2d at 1042. There was no policy justification for a rule that protected a supervisor's improper interference, because such a rule would "effectively grant permission to a supervisor to act, even with the worst motives and methods, with impunity." *Id.* at 388, 710 P.2d at 1043. "To adopt such a rule would place the supervisor beyond the inhibitions of tort law." *Id*. The court then held that there was a genuine dispute as to whether the plaintiff's supervisor "intentionally and improperly" interfered with the employment relationship between the plaintiff and the hospital. *Id*.

McNeil does not argue that inducing Brands to resign due to gender bias would be proper. Gender discrimination in the workplace is contrary to public policy. Both Brands and the District had an interest in continuing a mutually beneficial employment relationship. Brands also points to evidence in the record that supports her allegation that McNeil's conduct led her to resign.

However, McNeil argues that the record does not reflect that his actions were motivated by animus, and therefore his conduct was not improper. He avers that he followed and reported on various District employees, and that his objective was to prevent the misuse of District resources, rather than to injure Brands. Brands, on the other hand, contends that McNeil wanted to intimidate her because he was upset that a

woman carried the title of chief and made as much money as she did.  Brands claims that McNeil followed other employees to cover up for the fact that he was specifically targeting her.  She points to the testimony of numerous witnesses who stated that McNeil made disparaging comments about women in the workplace.  Several witnesses also testified that Brands was the fist person McNeil followed, and that McNeil stopped following other employees after Brands resigned.  There is therefore a disputed question of fact as to whether McNeil's conduct was motivated by an improper purpose.

### 2. **Intentional Infliction of Emotional Distress**

To establish a prima facie case for intentional infliction of emotional distress, a plaintiff must demonstrate that the defendant: (1) engaged in "extreme and outrageous conduct;" (2) either intended to cause emotional distress or recklessly disregarded the near certainty that such distress would result; and (3) that the plaintiff suffered "severe emotional distress." *Craig v. M&O Agencies, Inc.*, 496 F.3d 1047, 1058 (9th Cir. 2007) (citing *Wallace v. Casa Grande Union High Sch. Dist. No. 82 Bd. of Governors*, 184 Ariz 419, 428, 909 P.2d 486, 495 (Ct. App. 1995)).   The trial court must make a preliminary determination whether the conduct may be considered so outrageous and extreme so as to permit recovery.  *Nelson v. Phoenix Resort Corp.*, 181 Ariz. 188, 199, 888 P.2d 1375, 1386 (Ct. App. 1994).  Summary judgment is only inappropriate "when reasonable minds could differ in determining whether conduct is sufficiently extreme or outrageous." *Bodett v. CoxCom*, 366 F.3d 736, 747 (2004) (quoting *Mintz v. Bell Atl. Sys. Leasing Int'l, Inc.*, 183 Ariz. 550, 554, 905 P.2d 559, 563 (Ct. App. 1985)).

#### a. **Outrageous Conduct**

To succeed, a plaintiff must show that the defendant's conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Craig*, 496 F.3d at 1058 (quoting *Cluff v. Farmers Ins. Exch.*, 10 Ariz. App. 560, 562, 460 P.2d 666, 668 (Ct. App. 1969), overruled on other grounds by *Godbehere v. Phoenix*

*Newspapers, Inc.*, 162 Ariz. 335, 783 P.2d 781 (1989)). The Restatement of Torts, cited with approval by the *Cluff*, *Mintz*, and *Nelson* courts, explains that:

> The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where someone's feelings are hurt. There must still be freedom to express an unflattering opinion, and some safety valve must be left through which irascible tempers may blow off relatively harmless smoke.

Restatement (Second) of Torts § 46, cmt. d.

Applying this standard, the Ninth Circuit in *Craig* reversed a district court's grant of summary judgment for a defendant who had repeatedly propositioned the plaintiff and had kissed her by force on one occasion. 496 F.3d at 1059. The court held that the defendant's behavior did not comprise "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Id*. Despite society's "rough edges," the plaintiff was not required to become "hardened" to her supervisor "repeatedly propositioning her inside and outside the office, following her into the bathroom, standing outside the toilet stall and then grabbing her and sticking his tongue in her mouth." *Id*. A reasonable observer could find such conduct to be outrageous and extreme, particularly in an employment context. *Id*.

Likewise, in *Steiner v. Showboat Operating Co.*, the Ninth Circuit held that a defendant's conduct could be considered "extreme and outrageous," where the defendant, plaintiff's co-worker, repeatedly called the plaintiff offensive names based on her gender in front of customers and other employees. 25 F.3d 1459 (9th Cir. 1994) (applying Nevada law but citing Restatement (Second) of Torts § 46, cmt. e, which *Mintz,* 183 Ariz. 550, 905 P.2d 559, cites with approval). The court was "unprepared to hold as a matter of law that public humiliation of an employee by her employer, accomplished through rude, crude sexually explicit remarks and actions, [could not] constitute intentional infliction of emotional distress." *Id*. at 1466-67. "[W]hile simple insults do not constitute intentional infliction of emotional distress, insults which include sexual or racial harassment may rise

- 12 -

1  to that level." *Id.* at 1466. Further, the court stated that, when an employee was subjected
2  to public humiliation, "the tort action is much more likely to lie." *Id.*

McNeil contends that it is rare to find extreme and outrageous conduct in the employment context, and that Brands cannot establish that his conduct was outrageous. *See Mintz*, 183 Ariz. at 554, 905 P.2d at 563. However, the Arizona employment cases that have held that the defendant's conduct was not sufficiently outrageous as a matter of law are cases in which the plaintiff's claim was premised upon actions that are routine in the employment context, such as hiring, firing, and promoting, even when taken for an unlawful purpose, or, in which the employer's actions, even if callous, were motivated by a legitimate business purpose. In *Mintz*, for example, the court held that a failure to promote by itself, even if due to sex discrimination, was not outrageous conduct. *See id.* The court also held that the employer's delivery of a letter reassigning the plaintiff's duties while the plaintiff was in the hospital could not form the basis of an intentional infliction of emotional distress claim because the employer had a legitimate business purpose for reassigning the plaintiff's duties and communicating that information to her. *See id.*; *see also*, *Nelson*, 181 Ariz. at 199-200, 888 P.2d at 1385-86 (plaintiff's termination in the middle of the night, escorted by security guards, and with news media present, was not sufficiently outrageous); *Wallace*, 184 Ariz. at 428, 909 P.2d at 495 (affirming a grant of summary judgment on an intentional infliction of emotional distress claim because "recommendations and decisions on nonrenewal of [plaintiff's] administrator contract, the changing of her duties and the reduction of her salary" were lawful and not outrageous); *Bodette*, 366 F.3d at 747 (employer's termination of the plaintiff without giving plaintiff a severance package was not outrageous because, "this type of termination goes on every day in the corporate world").

In contrast, in sexual harassment cases, the Ninth Circuit has repeatedly stated that "an employer owes his employees a greater degree of respect because of the employment relationship." *Steiner*, 25 F.3d at 1466 (citing *Dias v. Sky Chefs, Inc.*, 919 F.2d 1370, 1375 (9th Cir. 1990) (discussing Oregon law); Restatement (Second) of Torts § 46, cmt.

- 13 -

e)); *see also Ford v. Revlon*, 153 Ariz. 38, 42, 734 P.2d 580, 584 (1987) ("intentional infliction of emotional distress is often based upon claims of sexual harassment"). However, even drawing all reasonable inferences in favor of Brands, McNeil's conduct was not so outrageous as to "go beyond all possible bounds of decency." As alleged, McNeil's conduct was reprehensible. But Brands admits that she never felt threatened by McNeil and was never in fear for her safety. McNeil never inappropriately touched Brands, unlike the defendant in *Craig*, who forcefully kissed the plaintiff. *See* 496 F.3d at 1058. And, although McNeil allegedly commented to Brands and to others that he did not believe that a woman should be doing Brands's job or have the title of chief, those comments, while offensive, are not nearly as degrading as the comments made by the defendant in *Steiner*, who called the plaintiff a "dumb fucking broad," "cunt," and "fucking cunt," and who yelled to the plaintiff in front of customers and other employees, "You are not a fucking floor man [her job]. You are a fucking casino host. You comp every fucking fleabag that walks through the door. . . . Why don't you go into the restaurant and suck their dicks while you are at it if you want to comp them so bad." 25 F.3d at 1461-62. In comparison, McNeil's comments can only be construed as "mere insults, indignities, or threats." Thus, Brands cannot establish that McNeil's conduct was sufficiently outrageous.

### b. **Intent to Cause Emotional Distress**

McNeil contends that he did not intend to cause Brands emotional distress. However, Brands contends that the evidence indicates otherwise. She points to McNeil's derogatory statements about women and to testimony that suggests that McNeil was specifically targeting Brands in order to pressure her into quitting. Viewing the evidence in the light most favorable to Brands, there is a genuine issue of material fact as to whether McNeil intended to cause emotional distress.

### c. **Actual Emotional Distress**

To establish a prima facie case of intentional infliction of emotional distress, Brands must show that she suffered "severe" emotional distress. "A line of demarcation

- 14 -

should be drawn between conduct likely to cause mere 'emotional distress' and that causing 'severe emotional distress.'" *Midas Muffler Shop v. Ellison*, 133 Ariz. 194, 199, 650 P.2d 496, 501 (Ct. App. 1982). Crying, being stressed and upset, and having headaches is not enough to establish severe emotional distress. *Spratt v. Northern Automotive Corp.*, 958 F. Supp. 456, 461 (D. Ariz. 1996). Shock, stress, moodiness, and estrangement from friends and co-workers is also not severe enough. *Bodette*, 366 F.3d at 747. On the other hand, anxiety that results in physical symptoms such as high blood pressure, chest pains, fatigue, and dizziness, does constitute severe emotional distress. *See Ford*, 153 Ariz. at 41, 734 P.2d at 583. Anger and depression coupled with physical ailments such as headaches and hemorrhoids have also been found to constitute severe emotional distress. *See Pankratz v. Willis*, 155 Ariz. 8, 17, 744 P.2d 1182, 1191 (Ct. App. 1987).

Brands contends that, as a result of McNeil's conduct, her hypertension worsened, and she began to be fearful, anxious, and paranoid with respect to her activities outside the home. She claims that she often cried and was "fuchsia red" at work. One of her co-workers also testified that she visibly aged during the period of time that McNiel was following her. At oral argument, however, Brands admitted that she has no medical evidence to support her claim that her blood pressure increased.[1]

As alleged, Brands's symptoms do not constitute severe emotional distress under Arizona law. *See Midas Muffler Shop,* 133 Ariz. at 199, 650 P.2d at 501(citing as examples of severe emotional distress cases in which (1) plaintiff suffered heart attack and nervous exhaustion, (2) plaintiff's fright resulted in premature birth of dead baby, (3) plaintiff was found writhing in bed in a state of extreme shock and hysteria, (4) plaintiff suffered severe headaches and stress and her state of anxiety ultimately required hospitalization, (5) plaintiff suffered from multiple sclerosis and stress caused by the

---

[1] Brands also admitted that she was prescribed anti-depressant medications for an unrelated thyroid condition.

- 15 -

defendant's conduct caused a relapse that resulted in permanent impairment of her condition.). Brands therefore cannot satisfy the third prong of her intentional infliction of emotional distress claim.

Because Brands cannot establish the first and third elements of the tort of intentional infliction of emotional distress, McNeil is entitled to summary judgment on this claim.

### B. Lakeside's Motion for Summary Judgment

Negligence liability under Title VII can sometimes extend to the torts of non-employees that occur outside of the workplace. *See Little v. Windermere Relocation, Inc.*, 301 F.3d 958 (2001). An employer is liable for the conduct of a non-employee based not on the harassment itself, but on the employer's failure to take appropriate and reasonable responsive action. *Freitag v. Ayers*, 468 F.3d 528, 538 (9th Cir. 2006). The reasonableness of an employer's remedy will depend on its ability to stop the harassment by the person who engaged in the harassment. *Fuller v. City of Oakland*, 47 F.3d 1522, 1528 (9th Cir. 1995) (citing *Ellison v. Brady*, 924 F.2d 872, 882 (9th Cir. 1991)). In evaluating the adequacy of the remedy, the court may take into account the remedy's ability to persuade potential harassers from unlawful conduct. *Id.*

An employer can only be held liable for harassment of which it knows or should know. *Id.* Notice of the sexually harassing conduct triggers an employer's duty to take prompt corrective action that is reasonably calculated to end the harassment. *Swenson v. Potter*, 271 F.3d 1184, 1192 (9th Cir. 2001). The employer's obligation has two parts. The first consists of the temporary steps the employer takes to deal with the situation while it determines whether the complaint is justified. *Id.* In other words, the employer has a duty to investigate whether the harassment occurred. *Id.* The second step consists of the permanent remedial steps the employer takes once it completes its investigation. *Id.*

Inaction cannot be fairly said to qualify as a remedy reasonably calculated to end harassment, even where the individual harasser has voluntarily ceased harassment.

*Fuller*, 47 F.3d at 1528-29. Title VII does not permit employers to stand idly by once they learn that sexual harassment has occurred. *Id*. To do so amounts to a ratification of prior harassment. *Id*.

The District does not contend that Brands was not subjected to a pattern of discriminatory treatment or that a reasonable employee, in Brands's shoes, would not have felt forced to quit. Instead, the District argues that it acted reasonably because it did all that it could to stop McNeil. The District contends that only Chief Mineer, as Brands's supervisor, had a duty to respond to Brands's complaints, and that he did all he could to stop McNeil. Upon learning that McNeil was following Brands, Chief Mineer confronted McNeil and asked him to stop. Chief Mineer also wrote a formal letter to the Board which was read into the record during a public hearing denouncing McNeil's conduct and requesting that the Board take whatever action was necessary to stop McNeil. Chief Mineer also relayed his concerns about McNeil's improper conduct to several Board members.

Brands responds, however, that these actions were insufficient. She contends that the Board itself utterly failed to act upon Chief Mineer's concerns. She argues that, although the Board may not have had the power to discharge McNeil, firing McNeil was not necessarily required for the District to meet its Title VII obligations. A good faith investigation of the harassment may have been enough. *See Swenson*, 271 F.3d at 1196. The Board, however, did not take any action whatsoever. It did not conduct an investigation, and it did not censure McNeil, even though it was within the Board's power to do so.

The District rejoins that the Board had no obligation to respond to Brands's complaints because the Board was not Brands's employer, Chief Mineer was. The District admits, however, that Brands was employed by the District. Although individual board members are not agents of the organization on whose board of directors they sit, a board of directors resembles an agent in that it acts on behalf of others, and in that it is a fiduciary that owes duties of loyalty and care to the organization itself. Restatement

(Second) of Agency § 14C (1958). A plaintiff may state a Title VII claim against an organization based on the actions of the organization's entire board of directors. *See Lam v. Univ. of Haw.*, 40 F.3d 1551, 1560-64 (9th Cir.1994) (issue of fact existed as to whether committee's hiring decision was improperly influenced by the committee head's discriminatory attitude and comments); *Simmons v. New Pub. Sch. Dist. No. Eight*, 251 F.3d 1210, 1215 (8th Cir. 2001) (issue of fact existed as to whether discriminatory motive of board president influenced other board members to vote to terminate plaintiff employee); *cf. also Matthews v. Columbia County*, 294 F.3d 1294, 1297 (11th Cir. 2002) (single commissioner with unconstitutional motives who votes to eliminate plaintiff's job is insufficient to impute an unconstitutional motive to the commission as a whole and subject a county to liability under 42 U.S.C. § 1983). It follows that the Board's failure to act upon Brands's complaints could also subject the District to liability.

Moreover, the District cites no authority for the contention that no one other than Chief Mineer had an obligation to take action in response to Brands's complaints. The Board only cites *Little* for the proposition that the reasonableness of an employer's remedy will depend on its ability to stop harassment by the person who engaged in harassment. 301 F.3d at 968. The fact remains, however, that the Board did nothing in response to Brands's complaints. The record suggests that Chief Mineer, at least, was under the impression that the Board had the power to influence McNeil, which explains why Chief Mineer wrote a letter to the Board urging it to take action, and why he contacted several Board members directly about McNeil's conduct. The record also reflects that McNeil may have been encouraged by the Board's failure to act. As *Fuller* explains, employers have a duty to express strong disapproval of sexual harassment. 47 F.3d at 1528-29. Doing nothing amounts to ratification of prior harassment. Brands points to evidence that suggests that McNeil was encouraged by the Board's failure to act. The District has therefore failed to establish that it acted reasonably as a matter of law.

IT IS THEREFORE ORDERED that the District's Motion for Summary Judgment is denied (doc. #57).

IT IS FURTHER ORDERED that McNeil's Motion for Summary Judgment (doc. # 52) is granted on the claim for intentional infliction of emotional distress and denied on the claim for intentional interference with contractual relations.

Dated: May 24, 2010.

Neil V. Wake
United States District Judge